IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 11-00734 WHA |
| Plaintiff, | |
| v. | **ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| WAYLAND GIBSON, | |
| Defendant. | |

## INTRODUCTION

Defendant is charged with six violations of the terms of his supervised release. After an evidentiary hearing, this order finds defendant violated such terms as charged in Charges Two, Three, Four, Five, and Six, but that the government has failed to prove Charge One.

## PROCEDURAL HISTORY

In May 2018, United States Probation Officer Octavio Magaña filed an amended Form 12 charging defendant Wayland Gibson with (1) failing to notify probation at least ten days prior to a change in residence, (2) failing to submit truthful and complete written reports to probation within the first five days of each month, (3) leaving the judicial district without the permission of the Court or the probation officer, (4) unlawful use of a controlled substance, (5) unlawful possession of a controlled substance, and (6) failing to submit to a warrantless search (Dkt. No. 216).

This action then proceeded to two evidentiary hearings during which defendant admitted Charge Four and the October 2017 travel alleged in Charge Three. The Court heard live testimony from USPO Magaña, Kathleen Solis, and Maureen Stone. In addition to live witness

testimony, the record includes separately-submitted proposed findings of fact and conclusions of law, and closing arguments from both sides (Dkt. Nos. 227, 230, 237, 243–46, 248). Stipulated facts and any proposed finding of fact expressly agreed to by the opposing side shall be deemed adopted (but only to the extent agreed upon), even if not expressly stated herein. All declarative statements herein are factual findings.[1]

## FINDINGS OF FACT

The terms of defendant's supervised release required him to submit monthly reports listing his "primary residence" and any "secondary residence." Other than asking whether the secondary residence was "own[ed] or rent[ed]," the reports did not define "secondary residence." USPO Magaña considered a secondary residence to be a location where an offender stayed overnight "fairly frequent[ly]," but never discussed this definition with defendant. USPO Magaña agreed, moreover, that "many people wouldn't necessarily consider" a location they did not own or rent but where they stayed "on occasion" to be a secondary residence. At all relevant times, defendant reported a Daly City address as his primary residence and did not report a secondary address.

While living in Daly City, defendant became good friends with his neighbor, Maureen Stone, who worked as a legal secretary at a San Francisco law firm. Because Stone's son had gone through the legal system, she was motivated to help defendant change his lifestyle. Defendant and Stone spoke on a daily basis and Stone provided defendant with significant financial support. For example, pursuant to a verbal agreement, Stone lent defendant $25,000 to purchase a franchise in a janitorial services company and gave defendant her 2007 Corvette to trade it in for a Nissan truck for use in the janitorial company. Stone also permitted defendant to drive her Audi and Harley Davidson motorcycle and added defendant to the insurance policies for those vehicles.

---

[1] A June 27 order directed the parties to respond to the opposing party's proposed findings of fact and conclusions of law. The June 27 order further directed the parties to "state, separately as to each proposed finding, whether the responding party agrees with the proposed finding and if not in full agreement, then the full extent to which, considering the duty of good faith and candor, the responding party admits the proposed finding." The government's four-page response, however, failed to follow these directions. The government instead responded to only seven of seventy-one proposed findings of fact and none of the forty-eight proposed conclusions of law submitted by defendant.

2

Stone maintained her primary residence in Daly City near defendant's residence, which is also where she registered her vehicles and maintained her financial records and other important papers. In May 2017, however, Stone began to rent out her Daly City apartment and live in an apartment in Rohnert Park. Stone occasionally allowed defendant to stay at her Rohnert Park apartment, Apartment 341, and, sometime around January or February 2018, gave defendant a key to the apartment. Defendant stayed at Apartment 341 approximately four nights per month prior to April 2018. In April 2018, when defendant's relationship with his girlfriend became tense, defendant stayed at the Rohnert Park apartment upwards of six nights per month. Although defendant would occasionally stay at Apartment 341 more than one night in a row, he at no point stayed for an entire week.

In October 2017, around 3:20 a.m., defendant contacted the police to report being the victim of a robbery. The police report listed an apartment in Rohnert Park — an apartment at the same apartment complex as Stone's apartment — as defendant's address. Also according to the police report, defendant described Apartment 241 of this Rohnert Park complex as "his apartment." As he was required to do under the terms of his supervision, defendant reported the police contact and discussed the incident with USPO Magaña. Defendant told USPO Magaña that he had been in Rohnert Park for a business meeting with a friend. Following that incident, USPO Magaña grew concerned that the Rohnert Park apartment was defendant's residence but did not discuss that possibility with defendant.

In November 2017, at USPO Magaña's direction, USPO Chris Taylor interviewed Erin Solis, the property manager at the Rohnert Park apartment complex. Solis told USPO Taylor that Stone was one of the apartment complex's tenants, that defendant would visit Stone at the apartment complex, and that defendant "sometimes" stayed there. That same month, defendant broached the topic of moving away from Daly City during a meeting with USPO Magaña, explaining that he was having difficulties with his girlfriend. Nevertheless, USPO Magaña did not mention to defendant that he should include the Rohnert Park address as a "secondary residence" on defendant's monthly reports.

3

Solis's testimony during the evidentiary hearing was in accord. Solis had seen defendant around the apartment complex frequently enough that they were on a first-name basis. Stone had authorized defendant to pick up packages for her from the front office and Solis interacted with defendant in March or April 2018 about a dent in the wall of the garage Stone rented. Around that same time, Solis interacted with defendant when she went to flip a circuit breaker switch in Apartment 341 during the late afternoon. As far as Solis was aware, nobody else was present in the apartment at that time.

Beginning in April 2018, Stone (a legal assistant) supported a trial team scheduled for a federal trial. During that period of trial preparation and trial, Stone did not reside at her Rohnert Park apartment. Rather, at the beginning of trial preparation, she lived in a San Francisco hotel with the trial team. Eventually the team lacked the financial means to keep Stone in the San Francisco hotel, so she moved back to her Daly City apartment.

On April 9, USPO Magaña personally interviewed Solis in Rohnert Park. Solis confirmed that Stone rented Apartment 341, that defendant "sometimes stayed there," and that Solis was unsure whether or not defendant lived in the apartment. USPO Magaña did not check whether or not defendant was present at the Rohnert Park apartment after he interviewed Solis. Rather, he drove fifty miles to defendant's Daly City address where he knocked on the door, sent defendant a text message, and left a business card for defendant to find. That same day, defendant told USPO Magaña via text message that there had been issues with his girlfriend's drinking and "so [defendant was] going to be moving soon." USPO Magaña did not respond to that message.

On April 15, around 9:30 a.m., police again made contact with defendant at the Rohnert Park apartment complex after responding to a report of a domestic incident. Defendant's girlfriend was also present. The responding officer determined that no crime had occurred and directed defendant and his girlfriend to separate. Defendant's girlfriend returned home to Daly City and defendant stayed in Rohnert Park. The April 15 police report also listed Apartment 241 of the Rohnert Park apartment complex as defendant's address.

4

As reflected in the April 25 chronological log from USPO Magaña's supervision of defendant, by that date USPO Magaña had started to plan a search of the Rohnert Park apartment, suspecting the apartment to be defendant's "primary residence." USPO Magaña noted that the search "was time sensitive" and that defendant "ha[d] given notice that he will be moving."

On April 28, defendant sent USPO Magaña a text message asking USPO Magaña to "give [him] a call as soon as possible please." USPO Magaña responded, "What's up? Can't talk right now." Defendant responded, "OK can you call me when you get a chance. I have a few questions. thank you!" USPO Magaña did not reply or call.

On April 30, at 8:15 a.m., USPO Magaña and the United States Marshals Service arrived to conduct a search of the Rohnert Park apartment. When USPO Magaña and the Marshals Service knocked on the door, defendant responded with something to the effect of "hold on," but failed to open the door. The Marshals Service continued to knock and announced their intention to breach the door. In addition, USPO Magaña sent defendant a text message asking defendant to call him. Defendant called as requested but failed to come out of the apartment. Defendant eventually stopped responding to USPO Magaña's communications. Around 10:00 a.m., Stone arrived at the apartment. Stone called defendant to come outside, which defendant immediately did. Stone informed USPO Magaña that the apartment belonged to her, that she occasionally allowed defendant to stay there, and that she declined consent to search the apartment.

During USPO Magaña's subsequent search of the apartment, he found, in plain view, a marijuana "joint" and a receipt for four joints purchased from a marijuana dispensary. With the exception of a few pieces of clothing for a female child, USPO Magaña observed only men's clothing in the apartment. He also found various documents belonging to defendant, including documents related to a timeshare in Las Vegas, a credit card statement, car insurance information, bills of sale, and a vehicle registration card. Also present in the apartment were keys to two vehicles — a Nissan Titan truck and a Mercedes — and keys to an onsite garage containing motorcycles belonging to Stone and dirt bikes belonging to defendant. According to

5

Stone, she and defendant intended to move into a different two-bedroom apartment in Rohnert Park the following month and, accordingly, defendant had moved his clothes into Apartment 341 earlier in April. Since defendant's release from the halfway house in June 2018, he has resided at the new Rohnert Park apartment he shares with Stone.

The same day as the April 30 search, the undersigned judge issued a no-bail warrant for petitioner's arrest. Magistrate Judge Joseph Spero held a detention hearing on May 3. At the hearing, USPO Magaña argued in favor of detention and represented that his search of the Rohnert Park apartment uncovered nearly $100,000 in assets personally attributable to defendant. As USPO Magaña later acknowledged, however, this representation was inaccurate, as USPO Magaña had included in his assessment of assets vehicles owned by persons other than defendant, including those owned by Stone and defendant's father.

**ANALYSIS**

To revoke a defendant's supervised release, a district court must find by a preponderance of the evidence that a defendant violated a condition of supervised release. *United States v. King*, 608 F.3d 1122, 1126–27 (9th Cir. 2010). The government must also establish that the alleged conduct was willful. *United States v. Jeremiah*, 493 F.3d 1042, 1045 (9th Cir. 2007). Moreover, district courts "shall direct that the probation officer provide the defendant with a written statement that sets forth all the conditions to which the term of supervised release is subject, and that is sufficiently clear and specific to serve as a guide for the defendant's conduct and for such supervision as is required." 18 U.S.C. § 3583(f).

**1. FAILURE TO NOTIFY PROBATION OF A CHANGE IN RESIDENCE (CHARGE ONE).**

The Form 12 first charges defendant with violating the terms of his supervised release by failing to "notify the probation officer at least ten days prior to any change in residence." Specifically, the Form 12 alleges that although defendant reported an address in Daly City during the relevant period, he had also resided at the Rohnert Park apartment since October 2017. While the government has shown, by a preponderance of the evidence, that the Rohnert Park apartment was defendant's secondary residence, it has not shown that defendant willfully

6

failed to disclose this residence. The government has accordingly failed to prove defendant violated the terms of his supervised release as alleged in Charge One.

Defendant stayed at the Rohnert Park apartment regularly — at least six days per month in April 2018 and at least four days per month prior to that — and at times when Stone was not present. Stone authorized defendant to pick up packages at the Rohnert Park apartment and gave defendant a key "[s]o [defendant] could come and get away when he needed to" (Dkt. No. 229 at 189:15). Solis recognized defendant as someone associated with Apartment 341, saw defendant frequently enough that they were on a first-name basis, and encountered defendant alone in the apartment when she went to reset the circuit breaker one afternoon. Moreover, defendant's vehicles, personal documents — including time share documents, car registration documents, credit card statements, and insurance documents — and clothing were all present in Apartment 341 during USPO Magaña's April 30 search.

To be sure, defendant's personal documents found in Apartment 341 listed defendant's Daly City apartment as his address. It is also true that Stone testified defendant had only moved his property up to Rohnert Park in anticipation of their move to yet another two-bedroom apartment elsewhere in Rohnert Park. Importantly, however, two separate police reports, dated six months apart in October 2017 and April 2018, respectively, indicate that defendant told police that he lived at the Rohnert Park apartment. These facts, taken in their totality, demonstrate by a preponderance of the evidence that defendant stayed at Apartment 341 with sufficient frequency and regularity that he should have disclosed this "secondary residence" on his monthly reports.

What the record lacks, however, is evidence that defendant knew of his obligation to report the Rohnert Park apartment as a secondary residence. Defendant's monthly reports did not define "secondary residence." Nor did USPO Magaña discuss with defendant the circumstances that would trigger defendant's obligation to report such a secondary residence. Indeed, defendant attempted to broach the topic of leaving his then-primary residence in Daly City on at least two occasions. On both occasions, USPO Magaña knew that defendant occasionally stayed at the Rohnert Park apartment but nevertheless elected not to discuss

7

whether the Rohnert Park apartment was a "secondary residence" or defendant's obligation to report it as such. USPO Magaña agreed, moreover, that "many people wouldn't necessarily consider" a location they did not own or rent but where they stayed "on occasion" to be a secondary residence. The government has therefore not shown that defendant's failure to report the Rohnert Park apartment as a secondary residence was a willful violation of defendant's supervised release. Accordingly, the government has failed to prove Charge One.

### 2. FAILURE TO SUBMIT TO A WARRANTLESS SEARCH (CHARGE SIX).

Special condition number seven of defendant's supervised release provides:

> [T]he offender shall submit to a warrantless search of his person, residence, office, vehicle, electronic devices, cellular phone, or any property under his control. Such a search shall be conducted by a probation officer or any peace officer at any time with or without suspicion. Failure to submit to such a search may be ground for revocation; the offender shall warn any residents that the premises may be subject to searches.

There is no dispute that defendant failed to open the door when USPO Magaña and the Marshals Service arrived and announced their intent to conduct a search of Apartment 341. Instead, defendant only opened the door upon Stone's arrival nearly two hours later. As concluded above, Apartment 341 was defendant's secondary residence. This is a sufficient basis from which to conclude defendant failed to submit to a warrantless search as required. Unlike defendant's obligation to report the Rohnert Park apartment as a secondary residence, defendant was well aware of his obligation to submit any property under his control to a warrantless search. The terms of defendant's supervised release required him to not only submit his "residence" to a search, but also required him to submit his "person . . . or any property under his control" to search and to warn any residents that a premises may be subject to such a search. Accordingly, even if defendant was unaware of his obligation to report Apartment 341 as a secondary residence, this order finds defendant willfully violated the terms of his supervised release as alleged in Charge Six.

### 3. FAILURE TO TIMELY SUBMIT TRUTHFUL AND COMPLETE WRITTEN REPORTS (CHARGE TWO).

Defendant must submit monthly reports listing any vehicle he owns or drives. Charge Two of the Form 12 alleges that defendant violated this term of his supervised release by failing to report the purchase of two vehicles — a 2000 Toyota and a 2004 Mercedes. Defendant's monthly reports for October 2017 through April 2018 stated only that defendant drove a 2004 Land Rover he co-owned with his girlfriend. Stone, however, had given defendant her 2007 Corvette so that defendant could purchase a Nissan Titan truck for his janitorial business. Stone also permitted defendant to drive her 2014 Audi frequently enough that she paid to add defendant to the vehicle's insurance policy. Moreover, during the April 30 search, USPO Magaña found a March 2018 receipt for defendant's purchase of a 2000 Toyota and a 2004 Mercedes, and defendant registered the Toyota in his name. Nevertheless, defendant raises two arguments as to why the undersigned judge should discharge Charge Two.

*First*, defendant argues the record fails to establish USPO Magaña provided defendant with a "sufficiently clear and specific" written statement to alert defendant to his obligations with respect to the monthly report. Not so. The government fails to respond to this argument, but the monthly report clearly directed defendant to "[l]ist all vehicles owned or driven." This provided defendant with sufficient notice of his reporting obligations.

*Second*, defendant argues that he was not provided proper and sufficient notice of the charged violation. Charge Two of the Form 12 alleges that defendant violated the terms of his supervised release by failing to report the purchase of a 2000 Toyota and a 2004 Mercedes and that defendant's October 2017 monthly report contained evidence of this violation. The receipts for the purchase of the 2000 Toyota and 2004 Mercedes, however, reflect a purchase date in March 2018, and accordingly the October 2017 monthly supervision report identified by USPO Magaña does not support the allegation. The government again fails to respond to this argument. Nevertheless, this order finds that by detailing the vehicles which defendant failed to disclose, defendant had sufficient notice of the charged violation. Accordingly, this order finds defendant violated the terms of his supervised release as charged in Charge Two.

### 4. UNLAWFUL POSSESSION OF A CONTROLLED SUBSTANCE (CHARGE FIVE).

A defendant has actual possession of an item "if the person knows of its presence and has physical control of it, or has the power and intention to control it." *United States v. Thongsy*, 577 F.3d 1036, 1040–41 (9th Cir. 2009) (*quoting United States v. Cain*, 130 F.3d 381 (9th Cir. 1997). The parties agree that USPO Magaña's search of Apartment 341 turned up both marijuana and a receipt for the April 18 purchase of marijuana from a dispensary. At that point, Stone had moved back to her Daly City apartment. Accordingly, although USPO Magaña did not contact the dispensary to identify the purchaser of the marijuana, and although defendant did not test positive for marijuana use upon his entry into the halfway house following his arrest, the marijuana's presence in plain view when defendant was the only person making use of the Rohnert Park apartment indicates both that defendant knew of the marijuana's presence and that defendant had "the power and intention to control it." Accordingly, the preponderance of the evidence supports revocation on Charge Five.

### CONCLUSION

This order finds defendant violated the terms of his supervised release as alleged in Charges Two, Three, Four, Five, and Six, but that the government failed to prove Charge One. Sentencing will occur on **OCTOBER 30 AT 2:00 P.M.**

**IT IS SO ORDERED.**

Dated: September 11, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE